United States District Court
Western District of New York

United States of America,

*Plaintiff*

*vs*

Zachary Rogers,

*Defendant*

**Defendant Zachary Rogers' Sentencing Memorandum**
19-CR-00145-V

Dated: October 22, 2021

harrington &#x2618; mahoney
70 Niagara Street - Third Floor
Buffalo, New York 14202-3407
Ph: 716-853-3700
Facs: 716-853-3710
*Attorneys for Zachary Rogers*

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Zachary Rogers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.     Early life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    A.     Arrest in Montenegro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Extradition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A.     The beatings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    B.     Emergency hospitalization, loss of spleen . . . . . . . . . . . . . . . . . . . . . . . 17
    C.     Return to the U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Sentencing Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    A.     The recommended sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    B.     Statutory factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            *1.*     *Zach's conduct must be put into the context of pornography abuse* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
               The mechanics of addiction also explain Zach's other conduct . . . 25
               The allegation that Zach communicated with an underage girl is a mis-characterization of what he told agents . . . . . . . . . . . . . . . . 26
               Zach is part of a trend of otherwise harmless young men getting into trouble for viewing child pornography . . . . . . . . . . . . . . . . 27
            *2.*     *Zach has endured immense physical and psychological suffering as a consequence of his conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
               Dr. Kopfer's Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
            *3.*     *Even a sentence far below the guidelines range would reflect the seriousness of this offense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
            *4.*     *Zach poses no risk of re-offense or danger to the public* . . . . . . . . 33
            *5.*     *The Court has the power to send a strong message without imposing an unnecessarily heavy sentence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    C.     Other considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
            *1.*     *The conditions in which Zach was detained abroad* . . . . . . . . . . . 35
            *2.*     *Conditions in custody in Niagara County* . . . . . . . . . . . . . . . . . . 38
            *3.*     *The time that Zach spent in custody awaiting extradition* . . . . . . . . 39
            *4.*     *Number and content of images is not correlated to risk of re-offending*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
     5.   *Neither federal law nor the U.S. Sentencing Guidelines adequately recognize or accommodate offenses where the offense was motivated by pornography abuse and not by other sexual deviancy* . . . . . . . . 44
          Suggested reforms from the U.S. Sentencing Commission recognize the complexity of these cases . . . . . . . . . . . . . . . . . . . . . . . 44
     6.   *What Zach will endure in the years ahead* . . . . . . . . . . . . . . . . . . . 45
          "I'm a creep" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
          Family support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Supervised Release Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# Introduction

This memorandum is given to provide the Court with information about defendant Zachary Rogers before he is sentenced. Zach has pleaded guilty under an agreement with the United States to one count of possession of child pornography, a violation of 18 U.S.C. § 2252A(a)(5)(B). The sentencing guidelines range under the plea agreement is 97 to 121 months. This is also the range in the pre-sentence investigation report. Both parties may argue, under the agreement, for sentences outside the guidelines range.

As the Court considers sentence, it must ask why a young man like Zach has found himself under these circumstances. This is not an easy question to answer. Zach is a quiet but affable young man in his early thirties. He grew up in the Southern Tier of New York and has lived, aside from this case, an ordinary and law-abiding life. He is shy and thoughtful, sharply intelligent, perceptive, and polite. He has a quiet, mild-mannered sense of humor. He has intensely loving and supportive parents who have been in constant contact with him and with with me since the beginning of this case. Aside from a DUI conviction twelve years ago that occurred during a period when he struggled with alcohol abuse, Zach has no prior criminal history. He has no past history of misconduct toward children.

Zach is one of numerous other young men across this country with no prior history of this kind of misconduct who are currently facing prosecution for viewing child pornography online. Members of Zach's generation have had access to free and copious online

1

pornography through high-speed internet from a young age. This glut of online pornography has led in recent years to young men like Zach to accessing child pornography after viewing vast quantities of online pornography for years, or even decades, and gradually becoming desensitized to it. So, they turn to child pornography, despite having no actual interest in children, because of the "rush" that it brings.

This is precisely what happened to Zach. During a low period in his personal life, dissatisfied with work and increasingly isolated because of his shy, withdrawn nature, Zach became over-dependent on pornography. When he became desensitized to what he was viewing, he began to seek out and view child pornography. This was impulsive, a result of an overpowering need to seek out new and "harder" material, even though it disgusted him after the gratification had passed. He recognized, on many levels, that this was immoral and unhealthy, but his mind was warped by the impulsivity brought on by addiction. He was also intensely ashamed and too fearful to seek help. So, he continued to do it. At the same time, however, he did not act out physically against children, nor did he have any desire to do so.

This story  a young man is led into viewing child pornography after abusing regular pornography  is regrettably far too common. What is un-common, however,  is what Zach endured after he was initially investigated. After Zach came under suspicion for viewing child pornography, FBI agents executed a search warrant at Zach's apartment in Amherst in January, 2018. They confronted him about his offense. He immediately waived his rights, admitted what he had done, and signed a written confession. Then, left at liberty but told that

he would probably be arrested and sent to prison at some later date, the full horror of what Zach had done hit him. What had been an act of private, isolated desperation had now led to an immense reckoning that threatened to swallow up his life. ██████████████ ██████████████ Too ashamed to ask his friends or family for help, and still in the thrall of an emotional crisis, he decided to leave the country. He flew the next day to Vietnam. He eventually traveled to Montenegro.

While he was gone, Zach was indicted *in absentia.* This led to his eventual arrest in Montenegro. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████ After eight months in Montenegro, he was finally extradited to the U.S. last summer.

Since returning, Zach has been housed in the Niagara County Jail. He immediately entered a guilty plea and has cooperated with his prosecution. He has been now in pretrial custody for 16 months. He contracted COVID-19 in the jail and luckily suffered through only mild symptoms before vaccines were available. He has not seen his parents, Tom and Laura Rogers, in-person since before he left the country. The day of his sentencing will be the first time that he will have seen his family in years.

In light of these circumstances, the Court should impose a sentence that balances the

3

gravity of these offenses with the ordinary and extraordinary circumstances of Zach's life. Zach Rogers is not a predator in-waiting. He is one of a growing number of young men whose lives have been devoured by an un-acknowledged plague of pornography abuse in this country. There is no threat of continued offending from Zach, which can be ensured with supervision and treatment rather than lengthy incarceration. Zach has already suffered immensely as a consequence of his offense. ████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████

We ask that the Court impose a sentence below the Guidelines range. A sentence of 60 months, or five years less credit for time already served, would be commensurate with sentences imposed in similar cases. Alternatively, should the Court impose a Guidelines sentence, it should impose the absolute minimum range and no more than five years of post-supervised release. Because Zach has no financial resources and will likely struggle to find employment immediately after release, the Court should not impose a fine. Zach has already agreed to settle with the victims in this case with respect to restitution and will work to repay them as soon as he has the means to do so.

# Zachary Rogers

## A.    Early life

Zach was born in 1986 in Allegany, New York. His mom and dad, Tom and Laura Rogers, are friendly and humble people from working class backgrounds who have lived in Western New York for their entire lives. They met as high school sweethearts and married in 1984. Their first son, Zach's older brother Thomas, Jr. (TJ), was born soon after. Zach was born the following year. Tom and Laura were both 21 at the time.

The young Rogers family was poor but hardworking and closely-knit. Tom worked full-time as a maintenance man at a local newspaper. Laura stayed home to care for her sons all day and then worked evening and midnight shifts as a bartender and a waitress. She also occasionally delivered newspapers from the family car. She remembers a few occasions when she strapped the sleeping Zach and his brother into car seats and took them with her as she delivered papers in the early hours of the morning. Tom and Laura worked hard to get by and ensured that TJ and Zach never wanted for anything. They gave the boys plenty of love and attention.

The family lived at first in a trailer on a lot next to Tom's parents' home. When Zach was about 7, the family then moved into a nearby house left to them by Tom's parents. This house is located in the countryside, far from the nearest town. The nearest neighbors are a few miles away. Tom, Laura, TJ, and Zach all lived here together for all of Zach's childhood.

5

Other than friends he met at school and some cousins who lived down the road, Zach had few friends. He was especially close with his older brother. They always played together and never fought. Tom and Laura recall that the boys were so close that despite having separate bedrooms, they always played together and often slept in one another's bedroom, even in one another's bed.

Young Zach was shy and polite. He took after his father in that way. His parents recall that his room was always clean, his bed always made. He never argued, never fussed, never had behavioral outbursts or episodes of acting out. They recall that he was bright even from an early age and was very meticulous in his speech and manners. The family home had no doors to most rooms and the family lived very close together, but the Rogers family's natural propensity to shyness meant that Zach often spent large amounts of time alone when he was not playing with TJ. Zach was taught to be hardworking and self-reliant. Because of his natural shyness, he often did not complain to his parents, even when he needed or wanted help. His parents describe him as dependable and taking his own counsel. "He was," they said, "the kind of person you could count on."

Zach's childhood was largely uneventful except for a rare medical condition that manifested itself when he was 5 or 6: nephrotic syndrome, a potentially fatal auto-immune disorder that leads to dysfunction in the kidneys.[1] After Zach had a routine tonsillectomy, his

---

[1] Coincidentally, I also suffered from this condition at that age. Most cases resolve with treatment before reaching adolescence. It is extremely rare. Only 2-4 children out of 100,000 are diagnosed with the disorder every year.

parents noticed unnatural swelling in his abdomen and rushed him to a doctor. Zach's face became inflamed from edema and he had to take a course of steroids to suppress his body's auto-immune function. Because the disorder is painless, Zach did not realize how severely affected he was until he saw his face in a mirror at the hospital, which horrified him. Zach had to remain on steroids for a few years to treat the disorder. His parents noted that he became more irritable and aggressive during this period, a common side-effect of steroid use, but this subsided when he reached puberty and he naturally aged out of the disorder. In the meantime, Zach's family rallied around him and did what they could to help. The entire family, including his brother, went on a voluntary diet to help manage his fluid retention. They all did their best to make life easier for Zach.

Zach was a good student who earned good grades and even qualified for a large scholarship when he graduated from high school in 2004. He enrolled at the University of Pittsburgh (Bradford) to study engineering. This was his first experience moving away from home. He had a typical college experience, learning how to party with friends for the first time, but because of his shy, home-body nature, he soon realized that he did not fit in at Bradford. So, he sought a transfer to the SUNY University at Buffalo. He moved into the city so that he could be close with old acquaintances who were also attending school. He eventually switched majors to political science.

During this time, TJ moved to Virginia and started a family. He persuaded Zach to come live with him in the suburbs of Washington, D.C. to try to make his fortunes in a bigger

city. So, soon after graduating from college in 2008, Zach moved straight from Buffalo to Vienna, Virginia. He took a job as a waiter at an Outback Steakhouse until he got a better-paying job working as a customer sales representative at an imported tile company. His natural politeness and organization made him good at his job, but he was also painfully shy and did not like the bustling life in the city.

Around this time, Zach began to date his first serious girlfriend. He had dated girls in college, but none of those relationships had been particularly serious. His parents noted that he never wanted to talk about sex or romance. His relationship with this girlfriend lasted for a few years, but his parents learned that she was an unhealthy influence on him. She suffered from a number of psychological problems and was a source of deep stress to Zach. The relationship did not work. He worked hard at his job, did his best to put out a good face to the world, but inside, Zach began to suffer noticeably from a deep, natural tendency to depression and anxiety. Not wishing to bother his family, and unsure of who to turn to for help, Zach began to drink heavily. He had been a heavy drinker in college, but now his drinking became even heavier and more problematic. By 2009, he was essentially dependent on alcohol. He recognized this and knew that it was a problem, but he had no resources to deal with it. TJ was aware of a problem, but neither Tom nor Laura realized that he was in a dark place until after it had passed.

In November, 2009, Zach was arrested for DWI in Fairfax, Virginia. He was released from the station on a particularly cold night, without having proper shoes or a coat. Because

he was so embarrassed and ashamed, he did not even call his brother for help, instead walking home for miles alone in the cold. He quickly pleaded guilty and was given a suspended sentence the following month. His family did not learn about the conviction until later.

This incident was a wake-up call for Zach. He recognized that his relationship and his life in Virginia made him feel deeply isolated and unhappy. So, he decided to move home. The following year, he took a job in Buffalo with a company that did testing for consumer products, a hands-on job that he found deeply satisfying. He moved into an apartment in the Buffalo area. His parents remember him seeming much happier and more outgoing during this period.

This outward show, however, belied the reality inside, which was that Zach was still suffering from the depression and anxiety that had taken hold during his time in Virginia. While he cut back on his drinking and had ended his toxic relationship with his girlfriend, the pain and inner feelings of worthlessness and despair continued to simmer.

Zach had first discovered online porn when he was a young teenager. He had heard about it from classmates and, like many young boys his age, decided one night to sneak onto the family computer after everyone had gone to bed to find and look at it. Zach's parents, who were never very technology literate, did not know that so much online pornography was so widely available so easily. So they had never warned Zach against looking at it. Nor did

9

they keep any pornography in the house. So far as they knew, he had no idea what pornography was. In reality, Zach had discovered was a world of intensely graphic material available on countless free websites, all at his fingertips. He began to watch porn occasionally whenever his parents and brother were away.

By the time he went to college and then moved to Virginia, Zach had begun to watch pornography more frequently. With smartphones, high speed wireless networks, and free wifi, he could access it basically anywhere at any time. The fantasy of pornography the escapism and the spectacle of it  became an addiction. It provided for him the same thing that drinking did: a way of evading his deep inner torment, even for just a brief period of time.

By the time he moved back to Buffalo, Zach was viewing pornography almost every day. By the time he engaged in the conduct that led to this case, he was viewing it constantly during his off hours. For years, his only interests in the material were ordinary, run-of-the-mill pornography between adults. By the time he became truly dependent on pornography, he had taken to viewing more hardcore genres depicting unusual fetishes. Even though he did not pursue this fetishism in his personal life, and would have actually found it disgusting in person, he accepted it in pornography because he needed to feel "more of a rush." So, he sought out "harder and harder stuff" to do this.

As with his alcohol problems, Zach had learned to mask how seriously he was affected by this dependency. His parents remember that in the Christmas before he was

10

caught, he was cheerful and had bought them expensive presents. He seemed pleased that he had the means to do so. But they also remember that he was scarcely around, often keeping to himself even though he lived so close to them. Zach's family had no indication of this storm swirling below the surface. To them, he remained the same friendly, put-together young man he had always been. He seemed to love his job, spent time with friends, and even began to play guitar in a small band. But when he went home, left alone with sickness in his emotions, he needed to escape into more abstract fantasies.

This is what eventually led him to his arrest in this case.

# The Offense

It was some time before Zach stumbled onto child pornography. At first, it was accidental. A link on an adult website led to another site, which displayed the child porn. Zach was initially disgusted, but during one of his later searches for hardcore material,  he decided to search out child pornography deliberately out of curiosity. What he saw disgusted him again, but the simultaneous rush of viewing it because of the taboo satisfied his search for something harder. After the first time viewing it, Zach remembers feeling so worthless and disgusted with himself that he entertained thoughts of suicide. He would go a while without viewing child pornography, would grow bored with the other pornography he viewed, would download the child porn in a moment of desperation, view it, then delete it.

11

After, he was always filled with intense self-loathing. This led to a vicious cycle that then perpetuated the behavior. Zach, who had been raised in a good home and had never been violent or anti-social towards anyone, recognized that he was gratifying himself to images of child abuse, but in the moment, in the thrall of his torment, it felt irresistible.

Zach recognized that he had come to a dangerous place in his pornography use, and he even recognized the same kind of emotional turmoil that had led to his DUI arrest a few years before. In his own words, he felt he had "traded one addiction for another." He felt like an alien to himself. But he was unable to ask for any kind of help. He was mortified with shame at the prospect of asking his family, and suspected that any counselor or psychologist would have to report him to the police if he confided in them. He was left utterly alone, paralyzed by his demons, so the conduct continued.

Early on the morning of Thursday, January 25, 2018, Zach was at home in his apartment in Amherst when he heard a loud thump at the door. He looked out the window and saw a handful of armed federal agents outside. He immediately understood what had happened: he had been caught. He calmly allowed the agents, who were there to execute a search warrant, into his house. He agreed to speak to them and immediately came clean about what he had done, even signing a written confession.

Zach remembers a mixture of relief with overwhelming disgust and despair. His nightmare with the pornography abuse had come to an end. But the full horror of the

consequences finally struck him, as reflected in statements he made to the agents: "Oh god, I'm a fucking creep. What's gonna happen to me?" PSR [28] at ¶ 16.

The agents asked Zach questions and explained their concerns that he was a potential predator. Knowing that he was not a predator and wishing to cooperate, he agreed to do a polygraph at the FBI headquarters in Buffalo. The results of this exam were inconclusive, as he was so shaken by the full weight of that day's reckoning that he became too emotional to answer questions. After this, the agents took him back to his house. They informed him that they would likely be back to arrest him at a later date and that he was facing a likely sentence in prison. With that, however, the agents simply took Zach's electronics and left him alone. His roommate happened to be out of the house that weekend.

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

  ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

  ████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ He was desperate, drinking

as much as he could keep down, thinking that he had squandered his future. In a moment of

impulse, he remembered his long-standing desire to see the world ██████████, so he

decided to buy the cheapest ticket to the farthest destination he could find from New York.

That happened to be a one-way flight to Vietnam out of JFK Airport. He cashed out all of

his savings and left. Without telling his parents, his brother, or his friends, Zach drove to

New York City from Buffalo that day and left the country. His car, with a note addressed to

his family, was later found in the JFK airport parking lot.

Zach arrived a day later in Vietnam. A few days later, he decided to go to Europe, so

he went first to Ukraine. From there, Zach slowly traveled west to the Balkans, where he

14

ultimately arrived in Montenegro, a small republic on the Adriatic sea. He decided to stay there because he felt it was unlikely that he would be discovered.

## A.     Arrest in Montenegro

After reaching Montenegro, Zach worked at a hostel in exchange for room and board, and also worked for a man who did boat-tours on the coast in exchange for a little cash, which he used for food.

One day, hiking on his day off, Zach was arrested for trespassing. The police learned that he was wanted in the U.S. through INTERPOL. Transferred to a jail, Zach was beaten by other inmates so severely that he suffered the loss of his spleen, nearly dying from internal bleeding. He also suffered from numerous broken bones and cauliflowering on his ears.

# Extradition

Zach remained at the detention facility in Spuz, Montenegro for 7 of the next 8 months. Zach was housed with a group of other men whom he discovered were members of a local organized crime group.

15

## A.    The beatings

**B.      Emergency hospitalization, loss of spleen**



## C.    Return to the U.S.

Zach was flown back to the U.S. on June 19, 2020. He was arraigned on June 24, 2020 and did not seek release. He has been in custody since that time.

U.S. Marshals apparently did not become aware of what had happened to Zach until he returned. His family and I learned about everything the day after he returned. When I first met Zach, he was able to show me the surgical wounds on his abdomen, which were extensive.

I alerted Magistrate Judge Jeremiah McCarthy of the abuse at arraignment and asked that the Court direct the U.S. Marshals to do a medical exam to document his injuries and ensure there are no lingering complications. The Marshals later informed the parties that

Zach had been "medically cleared" on arriving at the Niagara County Jail, but it appears that this may have consisted of no more than a COVID-19 screening and a blood-pressure check. I subsequently informed jail staff of Zach's injuries and asked for specific medical inspection. Zach reports that he was given a checkup sometime in late 2020 that involved a nurse inspecting and taking pictures of his surgical wound, but no other tests or evaluations were done. His parents thought about hiring a private physician to do an inspection, but due to contact and visitation restrictions at the jail and concerns about cost, no such evaluation was undertaken. Luckily, his wounds have largely healed and he reports no discomfort from his internal injuries.

Zach's family and I made several efforts to find any records related to the attacks. The U.S. Embassy in Montenegro ultimately provided paperwork for the extradition process but this did not include any record of the attack. It is possible that no such records exist because Zach did not report his abuse to the authorities.



# Sentencing Considerations

Knowing now about Zach and the circumstances of his life, his offense, and his ordeal, the Court now has more context in which to consider relevant sentencing factors.

## A.     The recommended sentence

The plea agreement and PSR note that the prospective guidelines range is 97 to 121 months, a fine, and a period of supervised release of 5 years to life.

60 months of imprisonment with 5 years of post-supervised release would accomplish all of the requisite goals of sentencing.

## B.     Statutory factors

The Court is familiar with the statutory sentencing factors it must consider under 18 U.S.C. § 3553(a). These factors address different aspects of the case, the defendant, and the sentences available under the law.

Rather than frame a traditional argument that takes each factor in-turn, we offer a

20

number of considerations for the Court that will apply to all or most of the statutory factors. These considerations are offered in this way to ensure that they are not over- or under-weighted because of how the statute is designed, which sometimes has the effect of minimizing or equivocating important factors. This is unusual but we believe it is appropriate and, considering Zach and the facts of his case, a more appropriate approach.

### 1.    *Zach's conduct must be put into the context of pornography abuse*

The Diagnostic and Standard Manual, 5th Ed. (DSM-V) does not recognize "addiction" to pornography or any other pornography-related disorders or paraphilias, though psychologists and researchers have recognized addiction-like behaviors associated with overuse of it and have proposed adding over-use or abuse of pornography as a distinct diagnosis or even including it within a global diagnosis of "hypersexuality."[2] Despite lack of official recognition, most researchers have long-recognized that pornography abuse can mirror the dynamics of drug or alcohol abuse.

Drugs that form abusive patterns can alter the way that dopamine is released in the brain, which affects several areas of the brain related to behavior control. *See, generally,*

---

[2] *See* Martin P. Kafka, *Hypersexual disorder: a proposed diagnosis for DSM-V*, 39 ARCH. OF SEX. BEH. 377-400 (2010)("Specific polythetic diagnostic criteria, as well as behavioral specifiers, are proposed, intended to integrate empirically based contributions from various putative pathophysiological perspectives, including dysregulation of sexual arousal and desire, sexual impulsivity, sexual addiction, and sexual compulsivity.").

Todd Love, et al., *Neuroscience of Internet Pornography Addiction: A Review and Update*, 5 BEHAV. SCI. 388-433, 393 (2015). Sexual behavior can also have this effect: "[n]aturally occurring behaviors such as eating and sex have evolved such that they activate the reward system due to the fact that they reinforce behaviors necessary for survival." *Id.*

One influential study has suggested that in the typical course of an addiction, there are three stages of behavior. Volkow, N.D.; Wang, G.-J.; Fowler, J.S.; Tomasi, D.; Telang, F. *Addiction: Beyond dopamine reward circuitry*. 108 PROC. NATL. ACAD. SCI. 15037-15042 (2011). The first is the "binge/intoxication" stage, where response to an addictive stimulus  whether drugs or erotic stimuli  triggers a flood of dopamine in the brain's reward center.

> This results in acute positive reinforcement of the behavior that initiated the flood. In this impulsive stage, this positive reinforcement results in addictive related learning associations Neuroplastic changes begin to occur, however, as the continued release of dopamine in the NAcc leads to an increase in dynorphin levels. Dynorphin, in turn, decreases the dopaminergic function of the reward system, resulting in a decrease of the reward threshold and an increase in tolerance.

*Id.* at 394 (internal citations omitted). So, almost as soon as the brain feels intense pleasure in response to an addictive stimulus, the effect of that stimulus is simultaneously deadened, leading to an increased need for that stimulus. In the next phase, "Withdrawal/Negative Affect," the dopamine flood has "run its course," and parts of the brain associated with fear or anxiety become activated. *Id.* This leads to a decreased sensitivity to rewards and an increase in the reward threshold, which is called tolerance. "This further progresses to

22

negative reinforcement as the individual continues to engage in the addictive behaviors to avoid the negative affect associated with withdrawal." *Id.* Third, and finally, the last phase of typical addictive behavior is "Preoccupation/Anticipation," otherwise called "craving." The impairments due to chemical imbalance spread to other parts of the brain and begin once again to impair parts of the brain responsible for motivation, self-control, and other functions. *Id.* at 395.

Researchers have pointed to these mechanics at play in non-drug related patterns of compulsive behavior, including sex and pornography use.[3] Researchers in 2008 conducted a study in which they took fMRI scans of cocaine addicted patients presented with rapid (33 millisecond), preconscious visual cues (drug-related images). Childress, A.R.; Ehrman, R.N.; Wang, Z.; Li, Y.; Sciortino, N.; Hakun, J.; Jens, W.; Suh, J.; Listerud, J.; Marquez, K.; Franklin, T.; Langleben, D.; Detre, J.; O'Brien, C.P. *Prelude to Passion: Limbic Activation by "Unseen" Drug and Sexual Cues.* PLoS ONE 2008, 3, e1506. The same subjects were later shown preconscious sexually related visual cues (erotic images). The researchers found activation of the same limbic system/reward circuitry in subjects shown sexual cues as when shown drug-related cues. In a related literature review of neuroimaging studies of the human

---

[3] *See* Koob, G.F.; Le Moal, M. *Neurobiological mechanisms for opponent motivational processes in addiction.* 363 PHILOS. TRANS. R. SOC. B BIOL. SCI. 3113-3123 (2008): "A case can be made that there is strong face validity with the addiction cycle of preoccupation/anticipation (craving), binge/intoxication, and withdrawal/negative affect stages for compulsive gambling, compulsive shopping, compulsive eating, *compulsive sexual behavior*, and compulsive exercise." (Emphasis added).

sexual response cycle, other researchers concluded, "it is clear that the networks involved in human sexual behavior are remarkably similar to the networks involved in processing other rewards." Georgiadis, J.R.; Kringelbach, M.L. *The human sexual response cycle: Brain imaging evidence linking sex to other pleasures*. 98 PROG. NEUROBIOL. 49  81 (2012).

In his highly regarded book on neuroplasticity, *The Brain That Changes Itself* (Penguin, 2007), psychiatrist Norman Doidge summarized the research on addiction and the reward system, and stated that the continued release of dopamine into the reward system when an individual compulsively and chronically watches Internet pornography stimulates neuroplastic changes that reinforce the experience. Doidge went on to explain how these neuroplastic changes build "brain maps" for sexual excitement. He introduced an additional component of tolerance, in that previously established brain maps for "natural" sexuality cannot compare to the newly developed and continuously reinforced maps generated by continued compulsive watching of Internet pornography. So, the "addicted" individual progresses to more explicit and graphic Internet pornography in order to maintain the higher level of excitement.

All of this research tracks precisely with what happened in Zach's case. After years of viewing ordinary porn to cope with depression, anxiety, and loneliness, he became desensitized to it and started seeking harder material. This led to child pornography. He knew it was wrong, but in the rush of dopamine flooding his brain while viewing it, and in the feelings of deflation and anxiety that followed, his judgment was impaired. His brain

24

simultaneously rewarded him for viewing the material while also becoming desensitized to it in every interaction ("binge/intoxication"), leading him to feelings of worthlessness and disgust after ("withdrawal/negative affect"), followed by periods of craving to chase the high again, if only to overcome his feelings of self-loathing over what he had done ("anticipation/preoccupation").

Because pornography addiction is still not a recognized disorder, despite the wealth of research exploring it, no expert could make a diagnosis of any sort of dependency on pornography, even though Zach's pattern of pornography use strongly reflects addictive or abusive tendencies in the research described above. Also, because he has been held in custody since rendition, he could not be tested for any paraphilias using the standard image-viewing tests available, such as the Abel Assessment of Sexual Interest (AASI) or the LOOK Assessment of Sexual Interest.   However, given the lack of any indication of other misconduct before or after his offense, and given Dr. Kopfer's observations about Zach's personality and character, there is no indication beyond the fact of the offense itself that suggests any actual future risk of misconduct or danger to the community.

**The mechanics of addiction also explain Zach's other conduct**

The PSR refers to other alleged conduct that was linked to Zach's pornography viewing, including posting images of clothed adolescent girls from Facebook and Instagram

to "jailbait" sites (PSR at ¶ 19).  Zach only engaged in this behavior while simultaneously viewing or seeking-out child pornography, making it the result of increased dopamine rush and resulting mental distortion. As noted above, research on addiction generally and pornography use more specifically has shown that impaired judgment and impulse control is a symptom of acute substance dependency in drug addictions. Addictions of all sorts cause behaviors similar to brain injuries that impair "judgment and decision-making, characterized by a tendency to choose the immediate reward, at the expense of severe negative future consequences."   A. Verdejo-Garcia, et al., *Emotion, Decision-Making, and Substance Dependence: A Somatic-Marker Model of Addiction*, 4(1) CRR. NEUROPHARMACOL. 17-31 (2006).[4]

Zach did not engage in this type of behavior before he began to view child pornography, nor did this happen outside of his pornography viewing habits. There is no evidence that he ever solicited or attempted to meet an underage person, even when he was abroad before his arrest.

### The allegation that Zach communicated with an underage girl is a mis-characterization of what he told agents

At ¶ 20, the PSR reports that, when speaking to agents the day his apartment was

---

[4] Available online in PDF form at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2430678/pdf/CN-4-1-17.pdf.

raided, Zach told them that "[o]n one (1) occasion, the defendant communicated with a twelve-year-old female using social media. The defendant posed as a fifteen-year-old male." This is a mis-characterization of what Zach told the detectives. They had asked whether he had "*ever* had any conversations with anyone underage." Zach was rattled by the events of the day and, in the interest of full candor, told them that when he was himself actually fifteen years old, he had met and talked to a girl online. This would have been in the late 1990s when he was an adolescent. The agents apparently misunderstood what he had said.[5] The paragraph goes on to note that Zach "denied that he ever sent any images or videos to her or received any images or videos from her. The defendant denied that he ever attempted to meet the twelve-year-old female." *Id.* This is true. Zach has been brutally candid. There is no reason not to believe him. There is no evidence, nor is there likely to be any, that he posed as an underage boy during the period of his illegal pornography use.

Zach has objected to this part of the PSR. [33]. It is respectfully urged that the Court disregard it when considering sentence.

### Zach is part of a trend of otherwise harmless young men getting into trouble for viewing child pornography

Zach is part of one of trend of young men with no prior criminal history being charged

---

[5] If the FBI recorded interviews or confessions like other law enforcement agencies do, we probably would not have this misunderstanding.

with viewing child porn.

Zach is part the first generation of so-called "digital natives," a generation that has never known a world without the internet. Zach was a grown man when he committed this offense, but he had been viewing heavy amounts of pornography from a young age. Arguably his offense here was the culmination of an entire adolescent development overshadowed by pornography use.

According to the U.S. Sentencing Commission, there have 6,809 convictions for non-production child pornography offenses in just the last five years. Of these, 73% had no prior criminal backgrounds, and the average age was 42 years. See U.S. Sentencing Comission, Quick Facts on Child Pornography Offenses: Fiscal Year 2020, attached as **Exhibit B**. One plausible explanation for these demographics is that a large number of relatively young men who have been exposed to pornography for a long period of time have taken, as Zach did, to viewing child pornography out of a desire for a greater rush, but without any other indicators of sexually deviant interest in children.


2. *Zach has endured immense physical and psychological suffering as a consequence of his conduct*

The Zach Rogers who committed this offense is not the Zach Rogers who is to be sentenced for it. They are significantly different men. ███████████████



Now that he has been arrested and convicted for this offense, the shame and regret are overwhelming. It is difficult to understand the magnitude of shame that Zach feels. Treatment which he will now gladly participate in is still far away. He tries to cope by adopting a Stoic attitude towards his upcoming imprisonment, but it is no substitute for real help. He recognizes that he did harm to others and that he must now face the consequences for them. He does not pity himself or feel sorry that he will have to go to prison. He is ready to accept the sentence the Court imposes because he recognizes that it is the consequence of what he has done.

Attached as **Exhibit C** is a statement that Zach wrote. He intends to read it at sentencing. I wanted the Court, however, to have an opportunity to read it before then. It is unusual among statements of this type in child pornography cases because Zach recognizes the intense harm he has caused and feels regret about it. He does not pity himself or blame others for his mistakes. He accepts responsibility for his behavior and expresses sincere

regret.







### 3. Even a sentence far below the guidelines range would reflect the seriousness of this offense

The federal mandatory minimums for receipt (18 U.S.C. § 2252A(a)(2)) and possession of child pornography (18 U.S.C. § 2252A(a)(3)) are five and ten years, respectively. The average sentence as of 2020 for distribution of child pornography was 133 months, for receipt 95 months, and for possession, 74 months. Ex. B, at 1-2. Approximately 40% of all offenders were sentenced within the guidelines range, but 58.5% received a downward variance, resulting in an average sentence deduction of 38.5%. *Id.* This includes *all* child pornography offenders, including distribution offenders. *Id.* This reflects the recognition among many federal judges nationwide that the average guidelines range for

32

these offenses is perhaps too high, and that below-guidelines sentences are appropriate even for this severe conduct.

Zach's proposed guidelines sentence is greater than average for simple possession, even though his conduct did not involve anything other than viewing child pornography, because his range is inflated by the number and content of the images he possessed. As noted below at p. 40, research has shown that the number and content of images have no correlation to risk of future offending, and even the U.S. Sentencing Guidelines Commission has urged reforms to the upward enhancements for these factors.

### 4.    *Zach poses no risk of re-offense or danger to the public*

There is no indication from the record that Zach poses a risk to others in the future. The PSI recounts some information from his initial interview with the FBI that the defense has objected to, as noted above at p.27, Dr. Kopfer's report found *no* indications of anti-sociality personality tendencies or any of the other typical psychological distortions that accompany most serious, hands-on child pornography offenders. The 2021 Report to the Congress on Non-Production Child Pornography Offenses from the U.S. Sentencing Commission observed that "the primary risk factors for other sex offending were holding deviant sexual beliefs and anti-sociality." 2021 Report at 39. Zach has never rationalized or justified his past conduct in terms of what was done to the children in the images. Nor did

33

he seek out specifically violent or younger material. This echoes findings that the Commission made in its earlier 2012 Report urging overhauls to the enhancement scheme for these offenses in the Guidelines. This is discussed more below at p.40.

5.  *The Court has the power to send a strong message without imposing an unnecessarily heavy sentence*

This Court should not presume that a less-than-guidelines sentence sends a "weak" message to the public. Zach has already spent almost two years in custody and stands to serve more. He will not receive any counseling in that time █████████████████████ ████████████████████████████████████████████████████. For an ordinary person, any length of time in federal prison, for any offense, is serious, particularly for an offense that did not involve hands-on offending. For Zach, it will be worse. He  is also at risk of suffering future abuse at the hands of other inmates, █████ █████████████████████████ As noted above, at 32 , most federal judges around the country impose below-guidelines sentences for child pornography offenses, including even distribution.

34

## C.    Other considerations

### *1.    The conditions in which Zach was detained abroad*

The appalling conditions in which Zach was detained led directly to the assaults against him and the lifelong physical and psychological injuries that he suffered. In *United States v. Carty,* 264 F.3d 191 (2d Cir. 2001), the Second Circuit vacated sentence after a district court judge refused to grant a downward departure under 18 U.S.C. § 3553(b) for the appalling conditions in which the defendant had been held while awaiting extradition to the U.S. from the Dominican Republic. Carty had fled to the Dominican Republic when he came under suspicion of narcotics trafficking. Arrested by Dominican authorities at the request of the DEA, he was held for almost a year in a "four-foot by eight-foot cell with three or four other inmates," where he had no light, no window, no running water, and was forced to use a hole in the ground as a toilet. *Id.* at 193. He lost forty pounds after this ordeal. *Id.* When these abusive conditions were cited as a justification for downward departure at sentencing, the district court dismissed them as essentially self-imposed, and held that it lacked authority to consider that as a departing factor under the guidelines: "[t]he conclusion is inevitable that the defendant fled [. . .] Mr. Carty was imprisoned in his own country in what I would have to assume are the standard conditions fo confinement in that country." *Id.* Rejecting this reasoning, the Second Circuit panel ruled that the law did not actually bar the lower court from at least considering the conditions of Carty's pretrial detention, and indeed ought to have done so. *Id.* at 164. So, the panel held, "pre-sentence confinement conditions may in

appropriate cases be a permissible basis for downward departures." *Id.*

Similarly, in *United States v. Rodriguez,* 213 F.Supp.2d 1298 (M.D. Ala. 2002), a defendant charged and later convicted of possession with the intent to distribute cocaine was raped by a guard in pre-trial detention in a local jail. The district court concluded that "to fail to take this rape into account in Rodriguez's sentence would mete out a disproportionate punishment to her, thus thwarting the Sentencing Guideline's express goal of equalizing sentences." *Id.* at 1303.

In *United States v. Mateo,* 299 F.Supp.2d 201 (S.D.N.Y. 2004), a pregnant inmate at the Metropolitan Detention Center in Brooklyn was denied proper natal care and was forced, after agonizing labor, to give birth lying on an "upright stretcher" in the jail's medical unit. *Id.* at 204. Her child survived, but Mateo later suffered from sexual harassment and neglect after the birth, which were traumatizing. *Id.* The district court granted a departure at sentencing for this ordeal, recognizing that it is appropriate in circumstances where "the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *Id.* at 208; see also *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) ("In imposing the sentence it did, the district court considered . . . [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States.); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 U.S. Dist. LEXIS 49543, 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding

36

that the defendant's pre-sentence conditions while [*10]  "incarcerated in the Dominican Republic, awaiting extradition to the United States . . . warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 U.S. Dist. LEXIS 18546, 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

The defense could not find information about the amenities at the facility where Zach was held, and indeed he received apparently good medical care there. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Also,

Zach was not yet charged when he left the country.

37

## 2.     *Conditions in custody in Niagara County*

Zach has been held in generally favorable conditions at the Niagara County Jail. However, the ongoing COVID-19 pandemic posed unique threats to Zach's health. Jails, it has been recognized, were particularly hard-hit nationwide during the pandemic. "A day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison." *United States v. Romero,* 2021 U.S.Dist.LEXIS 73877 at *11 (S.D.N.Y., Apr. 16, 2021). Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing. *See United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 492 F. Supp. 3d 306, 2020 U.S. Dist. LEXIS 181004, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."); *United States v. Salemo*, No. 11 Cr. 65 (JSR), 2020 U.S. Dist. LEXIS 86977, 2020 WL 2521555, at *3 (S.D.N.Y. May 17, 2020) ("BOP has taken a number of steps to mitigate the spread of the virus in federal prisons . . . [including] restrictions on visitors, restrictions on gatherings . . . [and] lockdowns lasting at least 14 days").

Accordingly, courts have granted downward departures to inmates who endured pretrial custody during the pandemic, even if they were not infected or hospitalized. *See, e.g.,*

38

*Romero,* supra, at *12 (granting downward departure because defendant had endured 13 months of pretrial custody during COVID-19).

### 3.     *The time that Zach spent in custody awaiting extradition*

Attached as **Exhibit D** is an English translation of the decision and order from the High Court in Podgorica, Montenegro approving Zach's extradition request. The order notes that Zach was ordered detained pending extradition as of October 24, 2019. He was extradited to the United States on Friday, June 19, 2020. He spent a total of 239 days in detention awaiting extradition, or nearly 8 months.

This Court has no authority to calculate credit for time served,[6] but it does have the authority to grant some consideration of the time Zach spent in custody, under appalling conditions, as a basis for a downward departure. Given the extreme hardships that Zach endured in custody in Montenegro, and because there is no assurance that the Bureau of Prisons would count his time in custody towards good time credit, this Court can and should consider imposing some departure under 18 U.S.C. § 3553(b) that ensures that Zach will receive at least *some* consideration for the time he spent there.

---

[6] 18 U.S.C. § 3585(b) allows only the Attorney General to determine credit for previous incarceration related to a case. *United States v. Wilson,* 503 U.S. 329 (1992); see also *United States v. Luna-Reynoso*, 258 F.3d 111, 117 (2d Cir. 2001) ("[T]he credit to be granted a defendant under § 3585(b) for time during which he was held in federal custody prior to sentencing is administered by the Bureau of Prisons.").

4.    *Number and content of images is not correlated to risk of re-offending*

The number of images a defendant possesses has no empirical relationship to his risk of re-offending or committing a sex offense. This has been recognized by the United States Sentencing Commission and others despite the "common sense" assumption that someone with a high number of images or particularly graphic images must be more sexually interested in children. This assumption is groundless. Research has shown that this concept does not bear on the defendant's deviance or risk of future offending. This research was conducted by highly regarded researchers in the field. *See* Seto, M., & Eke, A., *Predicting Recidivism Among Adult Male Child Pornography Offenders: Development of the Child Pornography Offender Risk Tool (CPORT)*, 39 LAW AND HUMAN BEHAVIOR 416-29 (2015).

In this research, it was observed that

> [s]ome potential risk factors were not predictive in this study. For example, multiple paraphilic interests is a significant predictor of sexual recidivism among contact sex offenders (Mann, Hanson, & Thornton, 2010), but having pornography depicting multiple paraphilic themes was not predictive of sexual recidivism here. Part of the problem may be that we are inferring sexual interests from known pornography content, which might be downloaded because of sexual interest but might also be downloaded out of curiosity, accidentally (in the case of large transfers of pornography files), or for trading purposes only.
>
> * * *
>
> We did not find significant associations for other proposed candidate risk factors (United States Department of Justice, 2010; United States Sentencing Commission, 2012). We thought evidence that child pornography was organized would predict sexual recidivism, because organization suggests involvement with the content. Someone with

organized child pornography might be more sexually preoccupied, and sexual preoccupation is a robust predictor of sexual recidivism among contact sex offenders (Hanson & Morton-Bourgon, 2005). Similarly, duration of collecting child pornography could reflect sexual preoccupation. Future research that directly assesses sexual preoccupations could shed more light on the role that this factor plays. We thought that opportunity factors such as having children in the household, working or volunteering with children, communicating with minors online, or having specific child contact information without obvious reasons would be associated with sexual recidivism, because access to potential victims plays an important role in sexual offending (see Seto, 2008, 2013; Wortley & Smallbone, 2006), and access to children has been found to distinguish child pornography only offenders from dual offenders (Babchishin, Hanson, & VanZuylen, 2015).

*Id.* at 427-28.

The Sentencing Guidelines Commission has recognized that the number of images is not a rational indicator of future risk of re-offense or future sex offending. The Commission noted in its 2012 report to Congress that "[n]early 70 percent of offenders who received an enhancement based on the number of images that they possessed received the maximum 5-level enhancement" for more than 600 images." 2012 Report at 209, fn 14. Indeed, speaking about all the typical aggravating factors, the Commission has pointed out that individually and collectively these factors actually do not usefully differentiate offenders on the basis of "culpability."

[A]s a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses

41

modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims),which are now readily available on the Internet. As a result, four of the of six sentencing enhancements in §2G2.2 *those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability.* These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

*Id.* (emphasis added).

The 2021 Report repeats this point.

Constrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, §2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Four of the six enhancements  accounting for a combined 13 offense levels  cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.

2021 Report at 4. For example, the report notes that in 2019, "*over 95 percent* of non-production offenders received enhancements for use of a computer and for the age of the victim." *Id.* (emphasis added).

The result of this has been that these enhancements, designed to target more serious and more culpable offenders, now apply in most cases, and so the average guideline

minimum and average sentence imposed for non-production child pornography offenses have increased since 2005. *Id.* at 5. The report notes, however, that notwithstanding this trend, or perhaps because of it, courts have imposed frequent downward departures; in 2019, for example, less than 30% of non-production offenders received a sentence within the guidelines range. *Id.*

The research and the observations above underscore that the number and content of images that Zach had do not indicate future danger. The PSR describes some of the images that he possessed. It also notes (at ¶ 14) that he possessed a large number of images. The number of content of the images that he possessed reflected the manner in which he found the material, not deviant interest. As the U.S. Sentencing Commission has observed, Zach, like many who now seek this material, used a peer-to-peer program that provided hundreds or even thousands of images per download. He did not know the specific content of each file he downloaded. It would have been impossible for him to view each image. He sorted some of the materials but generally deleted or avoided the images depicting younger children or hardcore abuse. Also, he intermittently downloaded and then deleted these images. This was not a sustained, long-term pattern of behavior, nor was it heralded by any other kinds of misconduct towards minors.

5. *Neither federal law nor the U.S. Sentencing Guidelines adequately recognize or accommodate offenses where the offense was motivated by pornography abuse and not by other sexual deviancy*

Neither Congress nor the U.S. Sentencing Guidelines have fully recognized the phenomenon of young men driven by pornography abuse into viewing child pornography where they are not otherwise attracted to children or motivated by deviant sexual disorders. This puts the Court in the position of weighing and balancing the causes of this behavior with the other known information about Zach in order to adequately determine what sentence should be imposed.

**Suggested reforms from the U.S. Sentencing Commission recognize the complexity of these cases**

The U.S. Sentencing Commission's 2012 Child Pornography Report did recommend that sentencing courts focus on three factors in imposing sentences in non-production cases: (1) the content of the offender's collection; (2) the offender's involvement, if any, with the broader online community of child pornography traffickers and enthusiasts; and (3) whether the offender had ever engaged in any abusive behavior apart from their child pornography offending. 2012 Report at xvii. This came as a tacit recognition that not all offenders who view child pornography were motivated by pedophilia or sexual deviancy. But this kind of accommodation falls far short of treating some cases as they should be treated. That is to say,

44

cases like Zach's ought to be treated as analogous to drug dependency or abuse.

Where, as here, the defendant develops a child pornography habit and is unable to seek help before he is subjected to prosecution, there should be some recognition that the defendant is not a sexual deviant who is liable to commit future offenses. State and federal courts alike have made significant strides in recent decades in treating substance abuse as a medical problem for which defendants need counseling and compassion, not the open-fisted persecution addicts had once faced in the early days of the "War on Drugs."

### 6.   What Zach will endure in the years ahead

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████

When he was first arraigned, Zach told me that he did not want to seek pretrial release because he wanted to begin serving time for what he had done. He considers this a form of penance for his behavior. ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

**"I'm a creep"**

When the FBI confronted Zach in 2018, he said "Oh my god, I'm a fucking creep."

*Cf.* PSR [28] at ¶ 16. There is no better encapsulation of how Zach has internalized the guilt

and shame over what he has done, even *before* he fled the country. *After*, especially in light

of what he endured in Montenegro, this guilt is even more intense. ███████████████

████████████████████████████████████████████ He has

already been removed from the environment and circumstances in which he committed this

offense, so he is already "rehabilitated" in that sense, but he will not begin to be truly

rehabilitated as a functioning member of society until he is given a chance to undergo

treatment, a process that will be deferred until *after* he is discharged from prison. In terms

of deterrence, it is hard to adequately state the level of remorse, shame, and horror that Zach

feels about what he has done.

**Family support**

On balance, it is important to note the strong support that Zach has received from his

family throughout this case. Tom, Laura, and TJ have been in constant contact with him and

with me and have consistently demonstrated their unconditional love for Zach. His parents

have already prepared a space in their home for him to live in when he is released from

prison. Aside from the guilt he feels for the victims, much of Zach's remorse is due to putting

his parents through so much uncertainty and fear, particularly when he was abroad. They

have worried about his health and well-being. They understand the full extent of what he did and what he has gone through. Their love and support will be a strong asset for Zach but he will only be able to fully use it when he is released and is able to live with them again.

The Court should consider these factors in imposing sentence.

# Restitution

Zach agreed to pay restitution as part of the plea agreement. The victims have negotiated with Zach through counsel and the U.S. Attorney's Office for a settlement of $39,000 total for all restitution claims. He does not have the financial resources to pay this now, but he will work to pay it off after he is released from prison.

# Supervised Release Conditions

47

Also, Zach should obviously receive therapy for his pornography issues. This can likely be addressed in regular sex offender therapy. However, sex offender treatment tends to be directed towards men with genuine pedophilia or antisocial personality traits. Zach has neither. Whatever distortions he had when he committed this behavior are no longer present, and in any case were never deeply-seated. He knew that what he was doing was wrong and he was deeply ashamed of it. There is no need of traditional therapy to get him to "come around" to acknowledging his guilt. So, the Court should allow Zach to seek and receive other counseling while on supervised release, in addition to or in lieu of ordinary sex offender treatment, that is specifically directed to his pornography issues.

# Letters

Various letters from Zach's friends and family are enclosed as **Exhibit E**.

These letters speak for themselves. The Court should note that they are consistent in their assessment of Zach's character.

# Conclusion

Russian novelist Fyodor Dostoyevsky wrote in his 1866 masterpiece *Crime and Punishment* that "[t]he man who has a conscience suffers whilst acknowledging his sin. That

is his punishment  as well as the prison." Even while he committed this offense, Zach knew that he was doing wrong. But he did not have the resources or the support to correct his behavior by himself. He suffered in his conscience even before he was caught.

Zach has prepared a statement that he will address to the Court at sentencing. Unlike some offenders in these cases, he fully recognizes the harm that he has done to the victims in these images. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

Zach is, in many ways, a broken man. ███████████████████████████

████████████████ But in his brokenness are the beginnings of a new and amended way of life, a new man. He is a bright and sensitive person who realizes that he committed a serious and morally grave crime. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ In spite of all of this, or perhaps because of it, Zach is eager to use the unexpected gift of his continued life.

Now, he appears before the Court unafraid to acknowledge his transgressions. Zach

has already been severely punished for his conduct.  The Court should impose a sentence that allows him to make use of that life and that allows him to become a free and productive member of society once more in the near future.

Dated:  October 22, 2021                    Respectfully submitted,

                                        /s/ Jesse C. Pyle

                                    JESSE C. PYLE
                                    harrington ❦ mahoney
                                    70 Niagara Street, 3rd Floor
                                    Buffalo, New York 14202-3407
                                    Tel.: 716-853-3700
                                    Facs.: 716-853-3710
                                    jpyle@harringtonmahoney.com

# EXHIBIT A



East Amherst
Psychology Group LLP

9750 Transit Road
East Amherst, NY 14051
716/636-1375 Fax: 716/636-4501
eapg9750@gmail.com

Adam J. Booth, Ph.D.
Cary S. Chugh, Ph.D.
Myles Faith, Ph.D.
Lesthia Isaacs, Ph.D.
Tanisha Joshi, Ph.D.
Paul M. Kopfer, Ph.D.
Margaret M. Syta, PMHNP
Andrew T. Wurl, Ph.D.
Nancy L. Zoeller, Ph.D.



Page 2





(ABCL cont.)





Score

Page 6





EXHIBIT B



# Quick Facts

*— Child Pornography Offenders —*

## Fiscal Year 2020

▶ IN FY 2020, 64,565 CASES WERE REPORTED TO THE U.S. SENTENCING COMMISSION.

▶ 1,023 OF THESE INVOLVED CHILD PORNOGRAPHY.[1]

▶ CHILD PORNOGRAPHY OFFENSES HAVE DECREASED BY 35.8% SINCE FY 2016.



**Number of Child Pornography Offenders**

**Length of Mandatory Minimum Penalties for Child Pornography Offenders FY 2020**



## Offender and Offense Characteristics[2]

- 45.1% of child pornography offenders were sentenced for possessing child pornography; 41.9% were sentenced for trafficking child pornography; 13.0% were sentenced for receiving child pornography.

- 99.7% of child pornography offenders were men.

- 81.3% were White, 12.2% were Hispanic, 4.0 % were Black, and 2.5% were Other races.

- Their average age was 42 years.

- 96.8% were United States citizens.

- 72.9% had little or no prior criminal history (Criminal History Category I);
  - 9.0% were CHC II;
  - 11.5% were CHC III;
  - 3.9% were CHC IV;
  - 1.8% were CHC V;
  - 0.9% were CHC VI.

- The top six districts for child pornography offenders were:
  - Western District of Missouri (42);
  - Western District of New York (33);
  - Middle District of Florida (31);
  - Southern District of Texas (31);
  - Western District of Texas (30);
  - Eastern District of Virginia (30).

## Punishment

- 99.3% of child pornography offenders were sentenced to prison; their average sentence was 102 months.

- The average sentence for offenders convicted of trafficking in child pornography was 133 months[3]:
  - 90.5% of these offenders were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 121 months.
  - 9.5% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 250 months.

- The average sentence for offenders convicted of receiving child pornography was 95 months:
  - 90.1% of offenders sentenced for receiving child pornography were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 83 months.
  - 9.9% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 202 months.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

*— Child Pornography Offenders —*

## Punishment (continued)

- The average sentence for offenders convicted of possessing child pornography was 74 months[4]:
  - ◆ 79.5% of offenders were convicted of an offense not carrying a mandatory minimum penalty; their average sentence was 61 months.
  - ◆ 20.5% had a prior sexual abuse or child pornography conviction and were subject to a ten-year mandatory minimum penalty; their average sentence was 125 months.

## Sentences Relative to the Guideline Range

- 39.2% of child pornography offenders were sentenced under the *Guidelines Manual*:

  - ◆ 30.6% of all child pornography offenders were sentenced within the guideline range.

  - ◆ 5.5% of all child pornography offenders received some other downward departure.
    - ◇ Their average sentence reduction was 41.6%.

  - ◆ 2.1% of all child pornography offenders received a substantial assistance departure.
    - ◇ Their average sentence reduction was 41.4%.

- 60.8% received a variance:

  - ◆ 58.5% of all child pornography offenders received a downward variance.
    - ◇ Their average sentence reduction was 38.5%.

  - ◆ 2.3% of all child pornography offenders received an upward variance.
    - ◇ Their average sentence increase was 57.3%.

### Sentence Relative to the Guideline Range (%)



### Average Guideline Minimum and Average Sentence (months)





**Sentence Imposed Relative to the Guideline Range FY 2020**



Under *Guidelines Manual* 39.2%

Within Range 30.6%

Other Downward 5.4%

Substantial Assistance 2.1%

Upward Departure 1.1%

Variances 60.8%

[1] Child pornography offenders are those convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor Receiving Transporting Shipping or Advertising Material Involving the Sexual Exploitation of a Minor Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2). It does not include cases where offenders are convicted of Production of Child Pornography (§2G2.1).

[2] Cases with incomplete sentencing information were excluded from the analysis. Cases that do not meet logical criteria were also excluded.

[3] Offenders convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor and Receiving Transporting Shipping or Advertising Material Involving the Sexual Exploitation of a Minor are subject to a five-year mandatory minimum penalty or 15 years with a prior conviction for sexual abuse or child pornography.

[4] Offenders convicted of Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2) are subject to a 10-year mandatory minimum penalty with a prior conviction for sexual abuse or child pornography.

SOURCE: United States Sentencing Commission  FY 2016 through FY 2020 Datafiles  USSCFY16-USSCFY20.

# EXHIBIT C

Zachary Rogers
March 11, 2021

Hon. Lawrence J. Vilardo
United States District Court Judge
2 Niagara Court Square
Buffalo, NY 14202

Dear Judge Vilardo,

I am being sentenced today for possession of child pornography. I engaged in this crime that I knew was wrong, yet I did not realize (or want to realize) the severity of my crime and the impact it had on others. For years, ever since I was a young teenager, I have been addicted to pornography. It has greatly affected my life in a harmful way, and negatively impacted the way I feel about myself and the way I interact with others. My relationships have suffered because of this addiction. I have dealt with low self esteem and undiagnosed depression for many years, and this addiction, along with my struggle with alcoholism, were both a catalyst for and a distraction from my problems. And like any addiction, my tolerance increased over time, meaning I was looking at more and more extreme pornographic material. Eventually, I ended up looking at child pornography.

I knew that I needed help and I wanted to help myself, but I didn't know where to turn. I was ashamed and embarrassed, and also afraid I would get myself in trouble, which is why I didn't get help. I never spoke to anyone about this issue.

In regards to how my crime affected others, I am deeply

ashamed. I am aware that 26 victims were identified in the material I possessed. These are all children that have been abused and exploited, who had experienced and endured so much pain and suffering, and had to cope with the emotional fear and terror of their situation. As a recent victim of seemingly endless physical and emotional abuse, it has now become much more clear to me how my victims felt and continue to feel. Their innocence was forcibly taken from them and their exploitation was put on the internet for all to see. By me possessing this material, I contributed to their suffering. For the rest of their lives they will have to live with the fact their suffering is on the internet. The guilt I carry due to my participation in this will always weigh on my conscience.

Whatever sentence I recieve today I will face without complaint, because I must suffer the consequences of my actions. It is my hope that my sentence will provide some kind of relief and justice to those I have wronged. I also hope that during my incarceration, I can improve myself and be able to eventually move forward in my life and (hopefully) forgive myself. With the help of my family and whater support systems are available to me, I believe this is possible.

Sincerely,
Zachary Rogers

EXHIBIT D

THE HIGH COURT IN PODGORICA
Ref. No. "Pom I" 163/19
In Podgorica, 24 October 2019

THE HIGH COURT IN PODGORICA, INVESTIGATIVE JUDGE Miroslav Bašović, in the extradition case against the accused ROGERS ZACHARY RYAN, for whom there is an international warrant granted by the mission of INTERPOL Washington, No. 2019/92800 (A-9611/9-2019) of 12 September 2019, issued on the basis of the Warrant No. 18-MJ-11 of 7 February 2018 issued by the United States District Court for the Western District of New York (H. Kenneth Schroeder, Jr. United States Magistrate Judge) for conducting a criminal proceedings for the criminal offense possesion of child pornography, referred to in Section 2252A(a)(5)(H) of Title 18, United States Code, pursuant to Art. 17 of the Law on International Legal Assistance in Criminal Matters and Art. 16 of the European Convention on Extradition and Art.175 paragraph 1 item 1 of the Code of Criminal Procedure, rendered on 24 October 2019 at 09:45am the following

### DECISION

that for a USA national, with the following personal data:

- ROGERS ZACHARY RYAN, father's name Thomas and mother's name Laura, maiden name Switland, born on 30 March 1986 in Allegany, the State of New York, United States of America, with residence in Buffalo, the State of New York, a national of the United States of America, with Bachelor degree in political science, unemployed, single, with no children, literate, who graduated from the Faculty of Political Science, of poor income status, allegedly previously convicted  for the offense of driving under the influence and granted probation, and with ongoing criminal proceedings taken against him in the State of New York for the criminal offense related to child pornography

### DETENTION IS ORDERED

Due to the existence of the international warrant granted by INTERPOL Washington, No. 2019/92800 (A-9611/9-2019) of 12 September 2019, issued on the basis of the Warrant No. 18-MJ-11 of 7 February 2018 issued by the United States District Court for the Western District of New York (H. Kenneth Schroeder, Jr. United States Magistrate Judge) for conducting a criminal proceedings for the criminal offense possesion of child pornography, referred to in Section 2252A(a)(5)(H) of Title 18, United States Code. This detention is ordered as extradition detention and it shall start as of 23 October 2019 at 15:30.

Detention ordered according to this Decision may last up to 6 months, after which it may be extended for another 2 months, and it shall start as of 23 October 2019 at 15:30.

The United States of America shall be notified about this detention through diplomatic channels and it will be required to file a letter rogatory for extradition of the detained person, and if letter rogatory is not filed within 18 days of start of detention or a maximum of 40 days since the detention started, the detainee shall be released. Should there be legitimate reasons why the United States of America could not file a letter rogatory within an 18-day period, it can file a request to prolong this period up to a maximum of 40 days, and should it not file a letter rogatory for this detainee within that period, detention shall be terminated.

Against this decision, an appeal to the Criminal Panel of this Court is allowed within 24 hours from the moment of its reception.

Any appeal against this Decision is hereby denied suspensory effect.

### Reasoning

The employees of the Bar Police Department - Ulcinj Division have informed this investigative judge that ROGERS ZACHARY RYAN was detained in Ulcinj on 23 October 2019 at 15:30, due to existence of a warrant issued by

INTERPOL Washington, No. 2019/92800 (A-9611/9-2019) of 12 September 2019, issued on the basis of the Warrant No. 18-MJ-11 of 7 February 2018 issued by the United States District Court for the Western District of New York (H. Kenneth Schroeder, Jr. United States Magistrate Judge) for conducting a criminal proceedings for the criminal offense possesion of child pornography, referred to in Section 2252A(a)(5)(H) of Title 18, United States Code

The accused was brought before the investigative judge and on that occasion, the police provided the investigative judge with the appropriate documentation - a copy of the international warrant. After being brought before the investigative judge, Rogers Zachary Ryan presented data that coincided with the information listed in the INTERPOL warrant.

The submitted documentation contains the information of the wanted person which says that this person is a national of the United States of America, and not a national of Montenegro. This court, with subject matter jurisdiction to deal with cases of international legal assistance and extradition of detainees did not receive a letter rogatory of the state of the United States of America to extradite the person mentioned in enacting terms of this Decision. Therefore, while making this Decision, Article 17 of the Law on International Legal Assistance in Criminal Matters was applied, as well as the European Convention on Extradition, which prescribe that in cases of urgency and when there is a risk that a foreign national would flee or hide, a police authority may deprive him/her of freedom for the purpose of brining this person before an investigative judge of the court of subject matter jurisdiction, on the basis of a request from an international state body, no matter how it has been sent. The request should contain information to determine the identity of a foreigner, and once detention is ordered, the investigative judge shall question the foreigner and then inform the foreign state through the judicial administration body. It is further prescribed that the investigative judge shall release the foreigner once the reasons for detention cease to exist or if the extradition request is not filed within the time period it has been imposed and which cannot be longer than 18 days after the date of the foreigner's detaining, and that the foreign state shall be informed on that time period, on whose request the time limit may be extended up to a maximum of 40 days.

Bearing in mind legal provisions of Article 175 paragraph 1 item 1 of the Code of Criminal Procedure and the provisions of the said Convention, which prescribe that detention may be imposed against persons for whom there is a reasonable suspicion of having committed a criminal offense, and there are circumstances indicating the risk of fleeing, the investigative judge has ordered this detention. The risk of fleeing comes from the fact that the wanted person is a foreigner - a national of the United States of America, who has been out his home country for some period of time, and who lef his home country to travel to Vietnam, then Ukraine, then Hungary, and then the countries in the Balkans, where he has been staying for a longer period of time.

The investigative judge treated the documentation provided in connection with the named person as a request of an international body sufficient to impose extradition detention in order to initiate the extradition procedure for the foreigner in order to prevent his fleeing during this period.

In consideration whereof it has been decided as in enacting terms herein.

INVESTIGATIVE JUDGE
Miroslav Bašović, duly signed


For the accuracy of the engrossment

*[signature provided]*
_____

*[Round stamp No.5 of the following contents:*
*High Court, Podgorica, Montenegro]*

**TUMAČ**
*Ana Ponoš*

za engleski jezik, postavljena u Crnoj Gori, rješenjem ministra pravde broj: 03-745-1655/17-1 od 24. amaja 2017. godine, na vrijeme od pet godina, potvrđuje da je ovaj prevod vjeran originalu.

Troškovi prevoda iznose _____ €.

U Podgorici, dana _____ .

Pečat _____        _____ Potpis

**INTERPRETER/TRANSLATOR**
*Ana Ponoš*

for English language, appointed in Montenegro by the decision of the Minister of Justice number: 03-745-1655/17-1 dated 24 May 2017, for the period of five years, certifies that this is the true translation of the original document.

Translation fee *Invoiced*

In Podgorica, en  24.10.2019

Seal                    Signature

THE HIGH COURT IN PODGORICA
Ref. No. Kv.br. 1061/19
On 11 December 2019

THE HIGH COURT IN PODGORICA, in a panel composed of Court President Boris Savić, as President of the Panel, and judges Miljana Pavlićević and Dragica Vuković, as members of the Panel, with the participation of clerk Aida Muzurović, in the extradition case against ROGERS ZACHARY RYAN, a US national, pursuant to the letter rogatory no. 184 of 27 November 2019 of the United States of America, for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code, at the panel's session held on 11 December 2019 rendered the following

## DECISION

It has been found that legal conditions for extradition have been met for a US national ROGERS ZACHARY RYAN, father's name Thomas and mother's name Laura, maiden name Switland, born on 30 March 1986 in Allegany, the State of New York, United States of America, with residence in Buffalo, the State of New York, with Bachelor degree in political science, unemployed, single, with no children, literate, who graduated from the Faculty of Political Science, of poor income status, previously convicted, for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code, pursuant to the letter rogatory no. 184 of 27 November 2019 of the United States of America.

Any expenses incurred in the course of these proceedings, apart from the expenses incurred in extradition of the defendant outside the territory of Montenegro, shall be borne by the budget of this Court.

Against this decision, an appeal to the Appellate Court of Montenegro is allowed within 3 days after the reception of a certified copy through this Court.

## Reasoning

The proceedings are ongoing before this Court in the extradition case against ROGERS ZACHARY RYAN, a US national, pursuant to the letter rogatory no. 184 of 27 November 2019 of the United States of America, for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.

In the documents accompanying the letter rogatory, the relevant authorities of the United States of America have submitted criminal charges initiated by the United States District Court for the Western District of New York of 10 July 2019, the arrest warrant issued by the United States District Court for the Western District of New York no. 19CR 145, documentation suitable for the identification of the requested person and a copy of the provisions of the law to be applied in the particular case.

After receiving the letter rogatory with accompanying documents and conducting an enquiry, the investigating judge of the High Court in Podgorica has submitted the case file with his opinion on whether the legal conditions for extradition had been met to this Panel to render a decision.

The High State Prosecutor's Office in Podgorica stated before the investigating judge on 4 December 2019 that the conditions for extradition of the defendant upon the request of the United States of America had been met. The attorney of the defendant, Tanja Ivanović from Podgorica, in a pleading filed on 9 December 2019, stated that she considered that the conditions for extradition of the defendant had been met.

Pursuant to Article 17 of the Law on International Legal Assistance in Criminal Matters, the European Convention on Extradition, and Article 175 para. 1 item 1 of the Criminal Procedure Code, extradition detention was ordered for the defendant based on the Decision of this court under reference no.

1

Pom I br.163/19 of 24 October 2019. Detention ordered according to this Decision may last up to 6 months, and it shall start as of 23 October 2019 at 3:30 pm.

Acting upon the request for extradition of the defendant, the Panel of this court has rendered:

- it has been decided as written in the enacting terms of the Decision.

Specifically, it was established from the case file of this Court under reference no. Pom I br.163/19, that a Warrant No. 18-MJ-11 dated 7 February 2018was issued by NCB INTERPOL Washington for the U.S. District Court for the Western District of New York, against the defendant Rogers Zachary Ryan for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.

The investigating judge, after hearing the defendant and establishing his identity, ordered extradition detention on the basis of the Warrant, by the Decision under reference no. Pom I br.163/19 of 24 October 2019, pursuant to Article 17 of the Law on International Legal Assistance in Criminal Matters, the European Convention on Extradition, and Article 175 para. 1 item 1 of the Criminal Procedure Code.

On 2 December 2019, the Ministry of Justice of Montenegro submitted to this Court the letter rogatory no. 184 of 27 November 2019 of the United States of America, for the extradition of the defendant for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.

Provisions of Article 2 para.1 of the Law on International Legal Assistance in Criminal Matters of Montenegro stipulate that mutual legal assistance shall be provided in accordance with an international agreement, whereas Article 2 para.2 stipulates that if there is no international agreement or if certain issues are not regulated under an international agreement, mutual legal assistance shall be provided in accordance with this Law, provided that there is reciprocity or that it can be expected that the foreign state would execute the letter rogatory for mutual legal assistance of the domestic judicial authority.

Provisions of Article 11 of the Law on International Legal Assistance in Criminal Matters of Montenegro prescribe the conditions for the extradition upon the request of the Requesting State, as follows: that the person claimed is not a national of Montenegro; that the offence for which extradition is requested was not committed in the territory of Montenegro, against Montenegro or its national; that the offence motivating the request for extradition is a criminal offence both under the domestic law and under the law of the country in which it was committed; that the criminal prosecution or enforcement of criminal sanction has not been barred by the lapse of time under the domestic law before the person claimed has been detained or interrogated as an accused; that the person claimed has not been already convicted by a domestic court for the same offence or he has not been acquitted of the same offence by the domestic court in a final and legally binding manner, except if the requirements prescribed by the Criminal Procedure Code for retrial have been met; or criminal proceedings have not been instituted in Montenegro for the same offence committed against Montenegro or a national of Montenegro; or the security for the fulfilment of property law claim of the victim has been provided if the proceedings have been instituted for the offence committed against a national of Montenegro;  that the identity of the person claimed has been established; that the requesting state presented facts and sufficient evidence for a grounded suspicion that the person claimed committed the criminal offence or there is a final and legally binding judicial decision; while provisions of Article 12 and Article 13 of the above Law stipulate that the extradition shall not be allowed for a political criminal offence, an offence connected with a political criminal offence or a military criminal offence within the meaning of the European Convention of Extradition, except for the criminal offences of genocide, crime against humanity, war crimes and terrorism, and for the criminal offence punishable under the domestic law and the law of the Requesting State by imprisonment for a term of up to one year or a fine.

Pursuant to the provisions cited above, this Panel finds that, in this case, the conditions for the extradition of U.S. citizen Rogers Zachary Ryan were met under the letter rogatory no. 184 of 27 November 2019 of the United States of America, for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.



Such decision has been made because Rogers Zachary Ryan is not a national of Montenegro and that the offence for which his extradition is requested was not committed in the territory of Montenegro, against Montenegro or its national, as it appears from the documentation attached to the letter rogatory. The evidence attached to the letter rogatory state that a decision to issue a warrant against Rogers Zachary Ryan has been made for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.

The aforementioned criminal offence is also a criminal offence under the Criminal Code of Montenegro and it corresponds to the criminal offence of child pornography referred to in Article 211 para.3 in relation to Article 2 of the Criminal Code of Montenegro.

Examination of the case file confirmed that the prosecution for the criminal offence in question has not been barred by the lapse of time by neither the law of the Requesting State nor the law of the Requested State. Also, the defendant has not been already convicted by a domestic court for the same offence or acquitted of the same offence by the domestic court in a final and legally binding manner, nor have criminal proceedings been instituted against him in Montenegro for the same offence, which was determined by this Panel by consulting the letter of the Supreme State Prosecutor's Office Kmp.No.314/19 dated 7 November 2019, and the letter of the Ministry of the Interior - Police Administration - Criminal Police Sector 03/1 No. 245/19-28951 dated 1 November 2019. There is also no evidence that extradition is requested for an offence for which the defendant has been already convicted or acquitted in a third country, that the imposed criminal sanction was enforced or discontinued, or that the discontinued part of the sanction has been abolished, that that the prosecution for this criminal offence has not been time-barred under the law of a third country, or that he has been acquitted of the same offence by a final judgment in a third country, or that he has been convicted by a final judgment in a third country but released from sentence.

This Panel also found that a fine or imprisonment for a term of 5 to 20 years has been prescribed for the criminal offence in question, therefore this condition was also met.

The investigating judge unquestionably established the identity of the defendant, both from the information provided with the warrant and from the personal information given by the defendant during the hearing recorded in minutes under reference no. Pom I br.163/19 of 24 October 2019, and from other information in the case file.

Therefore, having in mind the above and the fact that the offence motivating the request for extradition of the defendant, in the opinion of this Panel, is not a political criminal offence or an offence connected with a political criminal offence or a military criminal offence within the meaning of the European Convention on Extradition, this Panel found that the conditions for the extradition of the defendant were met under the letter rogatory no. 184 of 27 November 2019 of the United States of America, for the purpose of conducting a criminal proceedings for the child pornography offences, referred to in Section 2252A(a)(2)(A) and Section 2252A(b)(I) of Title 18, United States Code.

If Rogers Zachary Ryan is extradited to the United States of America, he may be criminally prosecuted only for the criminal offence for which the extradition has been granted, in accordance with Article 14 of the European Convention on Extradition and Article 33 of the Law on International Legal Assistance in Criminal Matters of Montenegro.

If Rogers Zachary Ryan is extradited to the United States of America, his time spent in extradition detention shall be accounted for in the imprisonment sentence under Article 33 para.4 of the Law on International Legal Assistance in Criminal Matters.

Any expenses incurred in the course of these proceedings, apart from the expenses incurred in extradition of the defendant outside the territory of Montenegro, shall be borne by the budget of this Court, within the meaning of Article 24 of the European Convention on Extradition and Article 30 of the Law on International Legal Assistance in Criminal Matters of Montenegro

3

In consideration whereof and pursuant to Article 20 para.1 of the Law on International Legal Assistance in Criminal Matters of Montenegro it has been decided as in the enacting terms of this Decision.

MINUTE TAKER
Aida Muzurović

PRESIDENT OF THE COURT/THE PANEL
Boris Savić

Is hereby delivered to:
- Chief State Prosecutor's Office
- The defendant in the Institute for the Enforcement of Criminal Sanctions (ZIKS)
- Attorney Tanja Ivanović
- Case file, reference no. Pom I br. 163/19

Once effective:
- Ministry of Justice
- Ad Acta

On _____ 2019

PRESIDENT OF THE COURT/THE PANEL
Boris Savić

**TUMAČ**
*Ana Ponoš*

za engleski jezik, postavljena u Crnoj Gori, rješenjem ministra pravde
broj: 03-745-1655/17-1 od 24. amaja 2017. godine, na vrijeme od pet
godina, potvrđuje da je ovaj prevod vjeran originalu.

Troškovi prevoda iznose _____ €.

U Podgorici, dana **13.01.2020**.

Pečat:                                                 Potpis

**INTERPRETER/TRANSLATOR**
*Ana Ponoš*

for English language, appointed in Montenegro by the decision of the Minister of Justice
number: 03-745-1655/17-1 dated 24 May 2017, for the period of five years, certifies that
this is the true translation of the original document.

Translation fee _____ €.

In Podgorica, on _____

Seal                                                  Signature

# EXHIBIT E

THOMAS JOSEPH ROGERS



February 28, 2021

Hon. Lawrence J. Vilardo

Unites States District Court Judge

2 Niagra Square

Buffalo, New York 14202

Re: Zachary Rogers

Dear Judge Vilardo:

I am Zachary's father. I am a production manager and printer at a local print shop and have been employed there for over 25 years.

I am writing this letter because I love my son very much. Zachary is a good loving person. Kind, respectful to everyone. I know he feels horrible for what he did. He does not feel sorry for himself, what happens to him does not bother him as much as it does what he put his family and friends through.

Letting us down I know hurts him more than anything does. Zach likes to please people, not hurt them. He is someone you want to be in that fox whole with. I have always been proud of him and I still am.

Hard working and always had a job since he was 16. He would help me with firewood or other jobs but not be looking for a handout.  He is self-sufficient and always wants to make it on his own. I get upset because he never asks for help. Zach is a contributor to society not a bum. He is a college graduate and a hard worker. He has family and friends that cannot wait to see him again. He loves his family and that is what kept him going. He was going to make it home to see his mom and dad.

I will always stand by my son because I know he would do the same for me. That is the kind of person he is, he stands up for others. He is ashamed for what happened and wants redemption. I know he will do whatever it takes to make things right for him and everyone around him. He deserves a second chance.

Something like this would never happen if there were no internet. Zach does not need jail time he needs help just like an alcoholic, drug user or a gambler.   Zachary has been punished; the US Marshalls had him held in a Serbian prison with no one that spoke English for 7 months beating him daily all most beating him to death. Our son is 6'4 and when he left that prison, he was 130 lbs. when he normally is 180.

Zachary deserves leniency on his sentence. I have 100 % faith in my son and you should too. He has a good heart and I know he would not let us down again. He realizes how precious his family and friends and life is and he wants to make it better.

 Sincerely,

Thomas Rogers

LAURA J ROGERS

██████████████████

██████████████

February 28, 2021

Hon. Lawrence J. Vilardo

United States District Court Judge

2 Niagara Square

Buffalo New York 14202

Re: Zachary Rogers

Dear Judge Vilardo:

I am Zachary's mother, an auditor and sales rep for an electronics company, KOA Speer Inc. in Bradford PA. For the last 23 years.

Zachary has been one of the greatest joys of my life, one of two sons I took great pride in raising with their father.

Zachary grew up in the small town of Allegany N.Y, where you knew everyone in the community. You could not help but to run into a teacher, an employer, someone from church or the friary that knew Zachary and would have something kind to say about him. He wasn't a child that needed disciplined, he was a good son from the very beginning.

We lived next door to Zachary's grandparents so they were a big part of his life and his catholic upbringing. He attended mass at church two doors down from home and made his first communion there as well as served as an altar boy with his brother. His grandmother was a big part of that and a big influence on his upbringing and he treated her with such love and respect as he did everyone in his life.. She is in a nursing home now, she says she reads the letter Zachary sent her recently; repeatedly, and she misses him so much. She has no idea where he is or why she cannot see him and the reality is she will likely pass before she gets to see him again.

Zachary and his brother were very close, shared the same friends since childhood, a great group of young men that have always been welcome in our home. Zach has always surrounded himself with good people and had a great work ethic that has always made us proud. Working to help during high school and college and several scholarships were a great help to our family financially. As young parents we struggled and with Zachary dealing with a childhood illness things were a little tough but he never complained, never felt sorry for himself, thankful for what he had. A son to be proud of who would come home to help his family whenever needed and not wait to be asked. If his father needed wood cut or help with a project around the house Zachary would be right there and not expect anything in return. Some days he would come home and they would just cook all day and share stories. Zachary even took two weeks off to go cross-country to see the Grand Canyon with his dad, a trip his father always wanted to take and luckily got to share with him.

Just sit and have a conversation with Zachary and you will find a humbled man looking to be accountable for his crime but also looking for forgiveness. Someone grateful to be alive and hoping to be back with his family soon. How long will Zachary suffer for his mistakes, probably a lifetime. Physically and mentally, he will never forget what started this horrible journey and how it almost took his life. Sadly, neither will his family. We are committed to staying strong with him and getting thru this together. Zachary will be accountable for his crime, he understands that, we all do, but no one will be accountable for what happened to him in Montenegro. The lawyer wouldn't talk to us, the translator ignored our cries and the country decided to play judge, jury and executioner with our son.

We sent Zachary an email every single day for 2 years. Hoping and praying he would see one and know that we were searching for him, we weren't giving up on him...it was the most painful two years of our lives, a son we cherished so much might be gone. Then we got that call, he was alive, he was ok! So we thought. They let Zachary call home and talk to us. Zachary said that call saved his life. He knew his family still loved and supported him and he wanted nothing more to get home and make things right. He asked for help during that call, not for the beatings because they had not started yet, he asked us to help him for what he had done. Shamed, deserving of any punishment but scared and confused.

Please consider leniency so Zachary's family can help in the healing and the education of his crime and personal suffering. We want to be part of the help needed to move him forward in a positive way. Do not leave him in a system that is already overcrowded and lacking in proper rehabilitation. Let the healing be with his family he so desperately needs back in his life. Our home is waiting, please ease his pain and ours.


Sincerely,


Laura Rogers

SUSAN SWETLAND



2/23/21

Hon. Lawrence J. Vilardo

United States District Court Judge

2 Niagara Square

Buffalo, New York 14202


      Re:    Zachary Rogers

Dear Judge Vilardo:

I have known Zachary my whole life as his Aunt and biggest supporter. I have been disabled for years now and have moved  closer to his family for comfort and support during my difficult times. Zachary has always been there to help his family whenever needed. A supportive son, nephew,  and grandson that would do anything for anyone.

Living so close I see and hear a lot. Whenever needed Zachary would come home, whether it was to help his father, grandmother or a friend he made himself available.  Zachary was a good son, you never heard of him getting in any trouble, friendly, respectful of his parents and those around him. He kept  in touch with lots of the family on both sides as he maintained a lot of  the family history an ancestry app. He made his parents proud and we all want nothing more but to have him back in our lives. He has so much more life to live and I have all the faith in the world he will make it a very positive one going forward..

I believe Zachary is truly sorry for his actions. This is something that he has to live with the rest of his life, and that within itself is more punishment than a person of his character should have to handle.

I  believe Zachary needs the opportunity to be educated about his crime  and get the help required to have a positive future and I don't know that he will get the help he needs being held long term in an institution that may not have the means to help him as his family could . Does the crime fit the punishment for what he has endured in the last year and ½ incarcerated both abroad and in the United States.  I know we have not heard the worse of what happened to Zachary, but let that day be soon and at home with the love of his family.  The scars he carries will be with him the rest of his life.  Don't let a lengthy sentence scar him and his family more.

Sincerely,

Susan Swetland

Megan Giardini

March 15, 2021

Hon, Lawrence J. Vilardo
United States District Court Judge
2 Niagara Square
Buffalo, New York 14202

   Re: Zachary Rogers

Dear Judge Vilardo:

I am Zachary's younger cousin and live here in Olean close to where our families were raised. I am a Trust Administrator at Community Bank in Olean. I have been a close friend and cousin of Zachary's my entire young life.

Our families were always together for holidays, birthdays, etc. We spent a lot of time at our grandma and grandpa's camp when we were growing up. This is where I had a lot of interaction with Zachary and nothing but enjoyable and fun.  Zachary always got along with everyone even after his long bought with his kidney disease he never complained or brought attention to his illness, just always positive and fun to be around.

Zachary has been thru so much emotionally at this time but his humble comments to his family lead me to believe he is still the person he always was, kind, forgiving and very loving to those around him. He has expressed such strong remorse to his family for his crime and the pain it caused so many and wants to humbly except any and all punishments handed down to him. However, I truly believe Zachary could benefit from leniency to educate himself regarding his crime and learn from it to move forward in a positive direction for himself and those around him.

Zachary's family misses and loves him so very much, we will all continue to support him in any way we can for a strong and productive future that he so graciously needs and we so desperately want.

With a new baby coming we want nothing more than for Zachary to be a part of his life when he comes into the world and starts to grow and learn from him and all our beautiful family.

Sincerely,

Megan Giardini

HEATHER GIARDINI



Date February 24, 2021

Hon. Lawrence J. Vilardo
United States District Court Judge
2 Niagara Square
Buffalo, New York 14202

Re: *Zachary Rogers*

Dear Judge Vilardo:

I am Zachary's cousin of 34 years. I work as a Loan process/Accounting Officer for Bobcat of Olean in NY, a minute away from the town where Zachary and I were raised. Our mother's are not only sisters, but the best of friends and were pregnant at the same time with us.

 Zachary and I grew up together, went to the same school and shared some of the same friendships until he left for college.

In the years I have known Zachary he has always been a very respectful and amiable person. We both were always the quiet ones at school and even at family events. We attended the same church and religion classes together where his mother was also a Religious Educator. I have three children that Zachary has been around since they were little and would like nothing more to see him back in our families lives soon enjoying the holidays again!

Knowing Zachary as long as I have, I am certain he is remorseful for any pain he has caused anyone involved and would hope to move forward in a more positive direction for both himself and his family. I believe Zachary should be given lenient treatment because of who he is as a person which is someone who has always shown respect and kindness to those around him. Zachary is a reliable family member and a friend you can talk to. Zachary is always there to help in any way he can and would never have to question his sincerity.

Under the circumstances of Zachary's already long and painful incarceration I am asking for you to please consider leniency so he can rehabilitate with his family who have been desperately waiting for him to come home.


Sincerely,
Heather Giardini